**Kimberly DeCAMBRE, Plaintiff,**

v.

**BROOKLINE HOUSING AUTHORITY, Matthew Baronas, Janice McNiff and Carole Brown, Defendants.**

**Civil Action No. 14–13425–WGY.**

United States District Court,
D. Massachusetts.

Signed March 25, 2015.

J. Whitfield Larrabee, Brookline, MA, for Plaintiff.

Amy M. McCallen, John Egan, Rubin & Rudman, LLP, Boston, MA, for Defendants.

### MEMORANDUM OF DECISION FINDINGS OF FACT AND RULINGS OF LAW

YOUNG, District Judge.

## I. INTRODUCTION

In a case involving a beneficiary's special needs trust and federal housing benefits, this Court is faced with determining whether such a trust, designed to prevent beneficiaries from losing their Medicaid and Social Security eligibility, should also protect beneficiaries from losing their income-based federal housing vouchers despite statutory language to the contrary. The issue before the Court turns on the interpretation of HUD regulations for calculating annual income for housing assistance eligibility purposes; specifically, whether income should include disbursements from a special needs trust that was funded by lump-sum settlements from a personal injury lawsuit. The plaintiff before the Court, Kimberly DeCambre ("DeCambre"), a Brookline, Massachusetts resident and participant in the Section 8 Housing Choice Voucher Program ("Section 8"), alleges that the Brookline Housing Authority ("BHA") unlawfully calculat-

ed her annual income in violation of the federal regulations pertaining to Section 8, as well as in violation of her substantive due process rights under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 3604(c) (the Fair Housing Act), 29 U.S.C. § 701 (the Rehabilitation Act), and 42 U.S.C. § 12131 (the Americans with Disability Act). Her allegations of disability-based discrimination were also raised against three BHA employees: Matthew Baronas (Assistant Executive Director), Janice McNiff (Leased Housing Representative), and Carole Brown (Director of the Leased Housing Department) (collectively with BHA, "Defendants"). DeCambre further requested a preliminary injunction against the BHA to stop it from including certain trust disbursements towards the calculation of her income for Section 8 eligibility. This Court heard oral arguments at a case stated hearing[1] on September 19, 2014, which greatly assisted the Court in assessing the parties' claims. The Court, first, rules that DeCambre does not have a section 1983 claim because the BHA's income determination was not arbitrary and capricious, and further denies DeCambre's motion for a preliminary injunction, with an order that her case be remanded for reconsideration before the BHA. The Court's reasoning is laid out below as required by Federal Rule of Civil Procedure 52(a).

## II. FINDINGS OF FACT

### A. DeCambre's Disability Status

DeCambre is fifty-nine years old, and presently lives with her adult son in a Brookline, Massachusetts apartment. *See* First Am. Verified Compl. & Demand Trial Jury ("Compl.") ¶ 11, ECF No. 9; *see also* Pl.'s Mem. Supp. Mot. Emergency Prelim. Inj. ("Pl.'s Mem."), Ex. G, Aff. Kimberly P. DeCambre ¶ 2, ECF No. 57. Since 2005, DeCambre has been a recipient of housing vouchers through her participation in Section 8, which is administered locally by the BHA and directly funded by HUD. As described on its website, Section 8 provides housing vouchers to "low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market." *Housing Choice Vouchers Fact Sheet,* HUD.gov (Sept. 17, 2014), http://portal.hud.gov/hudportal/HUD?src=/topics/housing—choice—voucher—program—section—8; *see also* 42 U.S.C. § 1437(f) et seq. These vouchers are administered by local agencies and housing subsidies are paid directly to landlords by the agencies. *See* 42 U.S.C. § 1437(f) et seq. The amount of the rent subsidy typically is the amount of the gross rent, "minus 30 percent of monthly adjusted income." *Id.* The BHA, which issues these rent subsidies in vouchers, is a local housing authority pursuant to Massachusetts General Law, chapter 121B, section 3, and a recipient of federal funding for subsidizing rent for its participants through an Annual Contributions Contract with HUD. Compl. ¶ 3.

It is undisputed that DeCambre is disabled as she is currently a recipient of Medicaid and Social Security benefits. Stipulated Factual R.: Case Stated ("Stip. Factual R.") ¶ 8, ECF No. 16. She cur-

---

1. Rather than holding oral arguments on the motion for preliminary injunction, the parties agreed to have a case stated hearing, delivering final arguments on the merits of the case and allowing the Court to make a judgment based on the record. *See TLT Const. Corp. v. RI, Inc.,* 484 F.3d 130, 135 n. 6 (1st Cir.2007) ("In a case stated, the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record. The court is then entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'") (citing *United Paperworkers Int'l Union Local 14 v. Int'l Paper Co.,* 64 F.3d 28, 31 (1st Cir.1995)).

rently receives Supplemental Security Income ("SSI") in the amount of $835.39 per month from the Social Security Administration, which provides supplemental income for "aged, blind, or disabled individual[s]." 42 U.S.C. §§ 1382c(a)(1), (a)(3); see Pl.'s Mem. 2. She also receives Medicaid administered by MassHealth. *Id.* at 5. DeCambre's "major disabilities" stem from kidney disease, which her treating physician describes as "recurrent kidney stones, severe hypokalemia (low potassium) requiring high dose daily potassium supplements, which is thought due to medullary sponge disease and/or Gitelman's syndrome." Pl.'s Mem., Ex. C2, Dr. Hsiao Letter, ECF No. 5–1. Her physician also stated that DeCambre suffered from "unusual skin patterns, which is presumed to be primary/secondary erythromelalgia," *id.*, while a second physician noted that DeCambre required "access to heat and central air conditioning to ensure temperature regulation" due to her "numerous medical conditions," Pl.'s Mem., Ex. C2, Dr. Crombie Letter, ECF No. 5–3. In her complaint, DeCambre further elaborates on her ailments as also including post traumatic stress disorder, fibromyalgia, arthritis, torn labrum in the hips, shoulder and elbow injuries, and a history of depression. *See* State Ct. R., Ex. A, Verified Compl. & Demand Trial Jury 5, ECF No. 12.

## B. Special Needs Trust

DeCambre is the beneficiary of an irrevocable Special Needs Trust ("Trust") under 42 U.S.C. § 1396p(d)(4)(A) and (C), which is defined as a trust "containing the assets of an individual under age 65 who is disabled ... and which is established for the benefit of such individual by ... a court." Pl.'s Mem. 2. As an irrevocable trust under section 1396p(d)(4)(C), DeCambre has no control over the Trust corpus, and the Trust itself earns "little or no interest." *Id.* The Trust was funded entirely from a series of lump-sum settlements from a personal injury and property damage lawsuit, and created by the Suffolk Superior Court for DeCambre in 2010. *Id.* at 3; *see also* Defs.' Opp'n Pl.'s Mot. Prelim. Inj. ("Defs.' Mem.") 3, ECF No. 10. The total amount of the settlement is estimated to be $330,000. Stip. Factual R. ¶ 7. DeCambre's counsel in this case, J. Whitfield Larrabee ("Larrabee"), is also the trustee of the Trust. Pl.'s Mem., Ex. C1, Letter to Joseph, ECF No. 5–3. Based on an expenses chart submitted by DeCambre, principal from the Trust has been used to pay for administrative trustee fees; cell phone, cable, and internet bills; veterinary care for cats; dental and medical costs; and travel expenses. See Pl.'s Mem., Ex. F, Kimberly DeCambre Supplemental Needs Trust Payments 12–12012 to 11–04–2013 ("Trust Expenses"), ECF No. 5–6.

## C. DeCambre's Section 8 Eligibility

DeCambre has been a participant in the Section 8 housing assistance program since 2005, and effective December 1, 2012, her monthly rental payment for her apartment was $312.00. Pl.'s Mem., Ex. A, Notice Rent Adjustment 2012, ECF No. 5–1. The fair market or contract rent totaled $1,595.00 per month, and she received $1,283.00 in housing assistance program payments. *Id.* On October 28, 2013, the BHA adjusted DeCambre's rent to $435 per month, explaining that certain disbursements from her Trust could not be classified as exempt medical expenses. Stip. Factual R., Ex. 4, Notice Rent Adjustment 2013, ECF No. 16–4. Upon request for the submission of statements from the Trust for their annual re-certification process, Stip. Factual R., Ex. 5, Letter from Lea Luz Rios, ECF No. 16–5, DeCambre submitted various trust-related documents to the BHA on November 12,

2013, Stip. Factual R., Ex. 6, Letter from Larrabee to Dalia Joseph, ECF No. 16–6.

Upon conducting their annual recertification in the fall of 2013, the BHA determined that DeCambre was no longer eligible to receive housing assistance because her income was too high. Defs.' Mem. 3. DeCambre self-reported her gross annual income to include $2,004 from food stamps, $9,748.68 from social security, $200 from her son's earnings, and $445 from ABCD Fuel Assistance, totaling $12,397.68 for 2013. Stipulated Factual R., Ex. 3, Appl. for Continued Occupancy, Sept. 10, 2013, ECF No. 16–3. The BHA, however, based on submitted income tax returns from De-Cambre's attorney, found that DeCambre received approximately $200,000 in distributions from the Trust between 2011 and 2013, and that her 2011 income tax return reported an income of $108,322. Defs.' Mem. 4. Further, the BHA found that the Trust disbursements totaled $31,749.01 in 2012 and totaled $62,828.99 between January and November 2013—which they determined should have been reported as income for purposes of recertification. *Id.* The BHA's yearly gross household income limit for a two-person household is $22,600. *Section 8—Housing Choice Vouchers,* Brookline Housing Authority (Oct. 31, 2014), http://www.brooklinehousing.org/ sect8.html. As a result, DeCambre was notified in a letter dated December 18, 2013, that effective February 1, 2014, she would be responsible for the full amount of her contract rent, totaling $1,560.00, and would no longer be eligible for housing assistance. Pl.'s Mem., Ex. B, Notice Rent Adjustment 2013, ECF No. 5–2. On January 13, 2014, DeCambre's counsel emailed the BHA indicating that she would appeal the rent adjustment decision. Stip. Factual R., Ex. 10, Larrabee Email of Jan. 14, ECF No. 16–10. A meeting was scheduled between the parties for February 7 to review her file. Stip. Factual R., Ex. 11, McNiff Letter of Jan. 24, ECF No. 1611. Meanwhile, DeCambre failed to pay the total amount of her adjusted rent ($2,200.00 in arrears), and received a notice to quit for non-payment of rent from her landlord in March 2014. Pl.'s Mem., Ex. G, Mar. Notice to Quit, ECF No. 5–7.

### D. Request for Reasonable Accommodation and Hearing Officer's Decision

On March 14, 2014, DeCambre submitted a Request for Reasonable Accommodation [2] to the BHA, as well as a request for a hearing. Pl.'s Mem., Ex. C2, Req. Reasonable Accom., ECF No. 53; *see also* Stip. Factual R., Ex. 16, Req. for Hearing, ECF No. 16–16. In it, she requested that "[the BHA] exclude from counting the expenditure of trust money" that was used towards DeCambre's car purchase, her cell phone and landline bills, and veterinary costs for the care of her cats, which she argued should be categorized as medical expenses, and thus be exempt from income calculation. Req. Reasonable Accom. De-Cambre argued her car was a medical necessity because she could not be exposed to hot or cold temperatures outdoors, her cell phone and landline were needed in case of an emergency due to her "medically precarious condition," and her cats were necessary as "companion animals for her

**2.** Pursuant to HUD provisions, any person with a disability is afforded the right to request reasonable accommodation from housing providers to change its "rules, policies, practices, or services so that a person with a disability will have an equal opportunity to use and enjoy a dwelling unit or common space." *Disability Rights in Housing,* U.S. Department of Housing and Urban Development (Oct. 30, 2014), http://portal.hud.gov/ hudportal/HUD?src=/programoffices/fair using—equal—opp/disabilities/inhousing.

mental health, mental and physical disabilities." *Id.*

An informal hearing was held at the BHA on May 27, 2014, with counsel for both sides present. Def.'s Mem. 5. The Assistant Executive Director of the BHA, Matthew Baronas, served as a hearing officer and issued a written decision on June 9, 2014. *Id.* In his decision, Baronas determined that the BHA had correctly calculated DeCambre's income and rental share, based upon their interpretation of HUD regulations. Stip. Factual R., Ex. 33, Baronas Decision, ECF No. 16–33. Citing to 24 C.F.R. § 5.609, he ruled that, although DeCambre's personal injury settlement is not considered income under HUD regulation, when these assets were placed in an irrevocable trust, the distributions from the trust must then be "considered income unless specifically excluded by regulation." *Id.* Baronas also determined that the BHA provided a timely hearing in good faith. *Id.* at 5–6.

DeCambre made a second Reasonable Accommodation Request on July 8, 2014, upon which she was notified by the BHA that she was missing a medical professional certification "attesting to the nexus between Ms. DeCambre's disability and the accommodation she claims to need." Defs.' Mem. 6. Initially, Larrabee signed this certification himself, arguing that no medical professional was needed, Stip. Factual R., Ex. 45, Larrabee Email of July 21, ECF No. 16–45, and submitted a certification from another physician who treated DeCambre for a hip and shoulder injury in May 2010, Stip. Factual R., Ex. 25, Certification of Med. R. John Doherty, Jr. M.D., ECF No. 16–25. Larrabee eventually submitted a certification from DeCambre's primary care physician on August 6, 2014. Stip. Factual R., Ex. 52, Larrabee Email of Aug. 6, ECF No. 16–52. On August 12, 2014, DeCambre received an-

other notice to quit, stating that she was $1,502.00 in arrears. Pl.'s Mem., Ex. G, Aug. Notice to Quit, ECF No. 5–7.

### E. Procedural History

DeCambre filed a complaint against the Defendants with the Massachusetts Commission Against Discrimination ("MCAD") on June 19, 2014, Stip. Factual R., Ex. 23, Mass. Comm'n Against Discrimination Charge Discrimination, ECF No. 16–35, and subsequently withdrew the complaint on August 26, 2014 as a result of pursuing her claims in court, Stip. Factual R., Ex. 30, Dismissal & Notification of Rights, ECF No. 16–30. On August 8, 2014, DeCambre filed this lawsuit against the BHA in the Massachusetts Superior Court sitting in and for the County of Norfolk, seeking $1,000,000 for damages, judicial review, and declaratory and injunctive relief arising from the BHA's decision to withhold her Section 8 Housing Assistance Program ("HAP") payments. State Ct. R., Ex. A, Verified Compl. & Demand Trial Jury 1, ECF No. 12. This action was removed to this Court on August 21, 2014. *See* State Ct. R., Notice of Removal 3, ECF No. 12.

DeCambre filed her motion for preliminary injunction on August 22, 2014. Pl.'s Mot. Prelim. Inj., ECF No. 4. The case stated hearing was heard on September 4, 2014. Elec. Clerk's Notes, ECF No. 11.

### F. Claims Raised

Along with the allegations that BHA miscalculated the amount of her Total Tenant Payment and refused to make reasonable accommodations for her disability upon request, in violation of the federal regulations governing Section 8 and her substantive due process rights, DeCambre also asserts breach of lease, interference with quiet use and enjoyment, declaratory and injunctive relief, and a writ of manda-

mus and judicial review. Def.'s Mem. 7. Both parties' arguments, however, were limited to the motion for preliminary injunction based on just her first two counts: (1) violation of federal civil rights under section 1983, and (2) disability discrimination under Massachusetts General Law chapter 151B as well as the related federal statutes. *Id.* As a preliminary matter, this Court finds that DeCambre did not adequately prove each element of her breach of lease and interference with quiet use and enjoyment claims, and therefore cannot prevail on these causes of action.

Adjacent to the central dispute over the HUD provisions and regulations, DeCambre claims that the BHA's determination "knowingly and willfully" violated her federal civil rights because it arbitrarily terminated her participation in Section 8 housing in a decision that was "not based on a preponderance of the evidence." Compl. ¶¶ 54–60. Second, she claims that the BHA denied her benefits "by reason of her disability" in violation of the Rehabilitation Act, Title II of the ADA, and the Fair Housing Act. *Id.* ¶¶ 65–68. Third, she moves for a preliminary injunction to enjoin the BHA from counting her Trust disbursements towards the calculation of her total tenant rent, and to resume payment of her housing vouchers in the amount of $1,283 per month, retroactive to July 1, 2014. Pl.'s Mot. Prelim. Inj.

## III. RULINGS OF LAW

### A. Regulatory Interpretation and HUD Guidance

Central to the core issues before the Court is the interpretation of several HUD regulatory provisions regarding the treatment of trust disbursements with regard to calculating annual income. HUD regulation 24 C.F.R. § 5.609 addresses exclusions and inclusions of "annual income" with regard to financial eligibility for Section 8 housing assistance, while 24 C.F.R. § 5.603 provides further definitions of "net family assets" and "total tenant payment," and explicitly excludes lump-sum personal settlement payments from the definition of annual income. The parties' differing applications of these regulations result in their opposing positions.

The salient facts can be summarized as follows: (1) DeCambre received a series of settlements totaling approximately $330,000 from a personal and property injury lawsuit between June 2010 and December 2012, (2) this settlement was deposited into an irrevocable Special Needs Trust created by the Suffolk Superior Court in June 2010, and (3) DeCambre has used principal from the Trust to pay for an automobile, travel expenses, cat veterinary care, and dental and medical fees. *See* Stip. Factual R. ¶ 7. DeCambre argues that the Trust disbursements used to pay for these items should not be counted towards her annual income, because the source of her funds are from income-exempt lump-sum settlements and, in the alternative, her expenditures should still be income-exempt under a separate exclusion for "temporary, nonrecurring, and sporadic" payments, *see* 24 C.F.R. § 5.609(c)(9).

### 1. HUD Regulations on Section 8 Income

Analysis begins by examining the plain meaning of the language of the applicable regulations.[3] Annual adjusted income for

---

**3.** *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) ("The starting point in every case involving construction of a statute is the language itself."); *see also Laracuente v. Chase Manhattan Bank,* 891 F.2d 17, 22 (1st Cir. 1989) ("The ordinary meaning of words ex-

Section 8 purposes is defined as "all amounts, monetary or not, which: (1) Go to ... the family head ... or (2) Are anticipated to be received from a source outside the family during a 12-month period following admission ... and (3) Which are not specifically excluded in paragraph (c) of this section." 24 C.F.R. § 5.609(a)(1)-(3).

Specifically excluded from annual income are: "Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains and *settlement for personal or property losses* (except as provided in paragraph (b)(5) of this section)." 24 C.F.R. § 5.609(c)(3) (emphasis added). Applied to DeCambre's initial lump-sum settlement, it is indisputable that this amount is excluded from calculation of annual income.

Complicating this analysis, however, is an adjacent provision under section 5.609. Section 5.609(b)(3) provides that annual income can include: "Interest, dividends, and other net income of any kind .... [w]here the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from all net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD." 25 C.F.R. § 5.609(b)(3). Net family assets,

> [i]n cases where a trust fund has been established and the trust is not revocable by, or under the control of, any member of the family or household, the value of the trust fund will not be considered an asset so long as the fund continues to be held in trust. *Any income distributed from the trust fund*

presses the underlying legislative purpose of

*shall be counted when determining annual income under [section] 5.609.*

24 C.F.R. § 5.603(b)(2)(emphasis added). Under a straightforward application of this provision, DeCambre's Trust disbursements would be counted towards her annual income, notwithstanding expenditures falling under separate exclusions such as medical expenses or temporary, nonrecurring spending. As these regulations do not address a situation where an irrevocable trust is funded by lump-sum settlements, this Court turns to other resources to glean guidance on this matter.

### 2. *Finley v. City of Santa Monica*

The core issue is whether a settlement loses its identity as a lump-sum settlement once it is placed in an irrevocable trust. One state court has addressed this question. In 2011, a Los Angeles County Superior Court held that distributions from a special needs trust were excluded from Section 8 annual income. *Finley v. City of Santa Monica*, No. BS127077, 2011 WL 7116184 (Cal.Super.Ct. May 25, 2011); *see also* Pl.'s Mem., Ex. D, Finley Op., ECF No. 5-4. The court in *Finley* held that both sections 5.609 and 5.603(b)(2) could be "harmoniously applied to determine that distribution of principal from the [trust] is not income." *Id.* at 6. This is because under 24 C.F.R. § 5.609(a)(1)(3), annual income includes both monetary and non-monetary amounts that "go to, or on behalf of, the family head" *and* "paragraph (c)" income exclusions. Ruling that "[the special needs trust] principal .... remain[s] excluded under 5.609(c)," Finley Op. 6, the *Finley* court concluded that the "distribution of principal from an irrevocable trust, which is not a family asset, is not annual income where the principal was

the statute.") (internal citations omitted).

excluded from annual income under section 5.609(c)(3)," [4] *id.* at 7.

Reading these provisions "harmoniously," however, does not exactly explain how a lump-sum remains a lump-sum, even when poured into an irrevocable trust. Rather, it only suggests that certain income exclusions predominate over other provisions. Here, the *Finley* court's statutory reading makes sense only if the annual income exclusions under 5.609(c) were deemed to override the net family assets definitions provision under 5.603(2), which includes distributions from an irrevocable trust in the calculation of annual income. To be clear, nothing in the regulations instruct that certain exclusions prevail over income inclusions, nor do they specifically address settlement-funded irrevocable trusts. When determining which regulatory provisions apply to DeCambre's expenditures, the Court cannot arbitrarily impose a reading which would impute greater weight to certain income provisions over others.[5] As a result, this Court does not follow the line of reasoning in *Finley* (noting that this Court was not bound by this decision to begin with).

Understanding, however, that the *Finley* court's reasoning addressed an equitable issue as well as a statutory one, the Court acknowledges the underlying problem of losing housing benefits due to use of a special needs trusts—especially when such trusts are established to protect disabled beneficiaries' access to Medicaid and Social Security benefits.[6] As cogently argued before this Court, special needs trust beneficiaries like DeCambre are unfairly disadvantaged in regards to federal hous-

4. The *Finley* court explains that this statutory reading comports with HUD's treatment of interest and principal. Finley Op. 6–7 (citing to the HUD Housing Choice Voucher Guidebook, AR 161–200, *available at* http://portal.hud.gov/hudportal/documents/huddoc?id =DOC—11749.pdf). Under Exhibit 5–2 of the Guidebook, a lump-sum settlement is considered a family asset and interest earned on the settlement is counted as income. *Id.* at 7. An irrevocable trust, however, is not categorized as an asset, so interest generated by the trust is only counted as income when it is distributed to the beneficiary, under section 5.603(b)(2). *Id.* As a result, sections 5.609(c) and 5.603(b)(3) "place[ ] interest distributions from an irrevocable trust on the same level field with distributions from family assets, including settlements. It also means that distribution of principal from an irrevocable trust, which is not a family asset, is not annual income where the principal was excluded from annual income under section 5.609(c)(3)." *Id.*

5. Congress has expressly delegated rule-making authority to HUD to establish procedures for income verification. See *McGann v. United States*, No. 98 CIV. 2192 SAS, 1999 WL 173596, at *6 (S.D.N.Y. Mar. 29, 1999) *aff'd*, 205 F.3d 1323 (2d Cir.1999) ("Here, Congress delegated rule-making authority to HUD to establish procedures for income verification in 42 U.S.C. § 1437f(k) (1994) and HUD promulgated regulations to define and verify income in 24 C.F.R. §§ 5.609, 5.617 (1998).").

6. This Court is not the first to note this special needs trust problem. Multiple legal publications and guidebooks caution trustees and attorneys on structuring special needs trust to protect beneficiaries from losing their federal housing benefits. *See generally* Thomas D. Begley, Jr. & Andrew H. Hook, *Drafting Issues in Self–Settled Special Needs Trusts*, Elder Law 2004, 31 ESTPLN 510, 514 ("[d]rafting a special needs trust is a complex undertaking involving a knowledge of public benefit law and many considerations pertaining to the beneficiary. These trusts do not readily lend themselves to forms and must be individually tailored to each situation."); Gregory Wilcox, Esq., *Special Needs Trust v. Section 8*, California Advocates For Nursing Home Reform (Nov. 1, 2014), http://www.canhr.org/publications/newsletters/NetNews/Feature—Article/NN—2007Q4.htm (noting that "it is becoming increasingly apparent that most SNTs often overlook a major problem.... In contrast to [Social Security] and [Medicaid], the Section 8 housing assistance program has no language in its rules that expressly recognizes and protects SNTs.").

ing assistance simply by their choice to place their settlement funds in a special needs trust. Tr. 23:1–15 ("The problem with this situation is . . . not only is the Brookline Housing Authority not treating people, and Ms. DeCambre, equally with other nondisabled people, they're treating her worse. . . . So you can have a trust, but you can't have any benefit from it."). As noted in *Finley,* DeCambre could have taken her personal injury settlement and placed it under her mattress, Finley Op. 6, from which she could freely have used it for any purpose without reporting her expenditures as Section 8 income.

■ Still, the BHA's decision to treat DeCambre's expenditures as disbursements from an irrevocable trust, counting it towards income under section 5.603, was a reasonable application of what this Court reads to be clear and unambiguous HUD rules. Revision of agency regulation is not in the district courts' repertoire, and HUD's interpretive rules on income calculation ought be given deference where they are a "reasonable interpretation." *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation . . . . a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); *see also McGann v. United States,* No. 98 CIV. 2192 SAS, 1999 WL 173596, at *7 (S.D.N.Y. Mar. 29, 1999) *aff'd,* 205 F.3d 1323 (2d Cir.1999) (explaining that the "plaintiff [cannot] challenge an interpretive rule, such as HUD's procedures on calculating the Section 8 subsidy pursuant to 24 C.F.R. §§ 5.609 and 5.617" because "[i]nterpretative rules . . . do not create rights, but merely 'clarify an existing statute or regulation.'") (internal citations omitted); *see generally* Linda D. Jellum, *The Impact of the Rise and Fall of Chevron on the Executive's Power to Make and Interpret Law,* 44 Loy. U. Chi. L.J. 141 (2012).

DeCambre's expenditures were from her Trust, which happened to be funded by her lump-sum settlement, and HUD income-counting rules reasonably were applied to her Trust disbursements. This is not to say that further guidance and clarification from HUD is not needed; addressing this very specific issue of settlement-funded special needs trusts are, to say the least, critically necessary to address this growing issue in federal housing and disability law.

Understanding the compelling equitable arguments raised by DeCambre, the Court considered HUD advisory letters and handbooks for further guidance.

### 3. 2007 New England HUD Advisory Letter

The BHA relies on a HUD Advisory Letter from 2007, which was sent to them by Benjamin Palmer, a HUD Portfolio Management Specialist, in April 2012. Defs.' Mem. 12. The Advisory Letter was provided by HUD's Boston Office of Public Housing, and specifically addressed Special Needs Trust ("SNT") disbursements and income calculations. Defs.' Mem., Ex. D, HUD Advisory Letter, ECF No. 10–4. Citing section 5.603(b)(2), the letter states "the corpus (principal) of an applicant's . . . SNT is not considered an asset," which comports with the plain reading of the provision. *Id.* at 1. The letter continues, "[d]istributions from the trust will be counted when determining annual income under 24 C.F.R. 5.609," *id.,* unless specifically excluded or included under sections 5.609(c) and 6.611, and that "[t]he ultimate determination of whether each of the above expenditures counts towards annual

income or falls within an exclusion or deduction is to be made by the Public Housing Authority," *id.* at 2.

While the letter provides examples of SNT distributions that are excluded or counted, it does not provide separate guidance as to whether the source of an SNT could potentially exclude its distributions from being counted towards annual income. *Id.* at 1–2 (providing only that "[a]nnual income does not include items such as ... [l]ump-sum additions to family assets such as ... settlement for personal or property losses.").

What can be gleaned from this letter, however, is an explanation for why SNT income is treated differently by HUD as compared to Medicaid: "Unlike Medicaid,[7] HUD is not reimbursed for benefits provided with excess trust corpus at the end of the beneficiary's lifetime; this accounts for some differences in the treatment of SNT income between the HUD and Medicaid regulations." *Id.* at 2. This is offered to explain why SNT expenditures "that do not fall under an exclusion or deduction are *presumed* by the regulations to be available for housing expenses and are therefore counted towards annual income." *Id.* (emphasis added). This seems logical

enough—because there is no guarantee of reimbursement from the excess principal upon a beneficiary's death, HUD chose to impose a more stringent income requirement on federal housing voucher participants.[8] The question remains whether this policy justifies the result of denying federal housing assistance to disabled SNT beneficiaries. The Court thinks not, noting that the policy does not directly speak to federal housing programs eligibility requirements nor does it suggest that lump-sum settlements should remain lump-sums regardless of the depository it is in. At most, this policy seems to suggest that housing authorities, who already carry "[t]he ultimate determination of whether each of the above expenditures counts towards annual income or falls within an exclusion or deduction," can choose to count certain non-excluded expenditures towards annual income. *Id.*

### 4. HUD Handbook on Net Family Assets

While the Advisory Letter does not provide specific guidance as to settlement-funded special needs trusts, a 2013 HUD Handbook on occupancy requirements confirms that settlement funds placed in irre-

---

7. Under Medicaid regulations, special needs trusts are defined so that "the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter." 42 U.S.C. § 1396p(d)(4)(A). No such provision exists under the HUD regulations on annual income.

8. For context, to become eligible for Medicaid, a recipient must meet the asset requirement for Supplemental Security Income. *See* 42 U.S.C. § 1382(a)(1) (defining income and asset requirements for disabled individuals). DeCambre currently receives both.

Medicaid and Social Security regulations explicitly exclude special needs trusts from being counted towards a beneficiary's re-

sources. *See* 42 U.S.C. § 1396p(d)(4)(A) ("This subsection shall not apply to ... [a] trust containing the assets of an individual under age 65 who is disabled ... and which is established for the benefit of such individual by a ... court."); *see also* 42 U.S.C. § 1396p(c)(2)(B)(iv) (preserving eligibility for medical assistance if assets were transferred to a special needs trust). HUD does not have an asset-based (nor disability-based) eligibility requirement for Section 8, but requires that a certain portion of a family's assets be counted towards annual income. *See* 24 C.F.R. § 5.603(b) (defining net family assets); *see also* 24 C.F.R. § 5.609(b) (listing what is included in annual income, including the "[in]terest, dividends, and other net income of any kind from real or personal property.").

vocable trusts are not assets. HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs, U.S. Department of Housing and Urban Development ("HUD Handbook") 5–39 (Nov. 3, 2014), http://portal.hud.gov/hudportal/documents/huddoc?id=43503c5 HSGH.pdf ("Assets placed in nonrevocable trusts are considered as assets disposed of for less than fair market value *except when the assets placed in trust were received through settlements* or judgments.") (emphasis added). This clarifies the definition of net family assets under 24 C.F.R. § 5.603(b)(3), which includes "the value of any . . . assets disposed of by an applicant or tenant for less than fair market value (including a disposition in trust . . .) during the two years preceding the date of application for the program." See *also* HUD Handbook 5–38 ("Owners must count assets disposed of for less than fair market value during the two years preceding certification or recertification.").

At oral arguments, the BHA raised an argument that a lump-sum is only a lump-sum for the year it was transferred into an irrevocable trust,

> but once it's been sitting in a trust for two or three years, it's no longer a lump sum, it's now an amount of money that the plaintiff is actively . . . taking distributions from and it is not a fair characterization to call that money a 'lump sum' any longer than the *one year period* within which that money is first received.

Tr. 9:4–9 (emphasis added). It is unclear whether the BHA was referring to the two-year penalty period for under-market transfer of assets, but this one-year characterization is not supported by the regulations, nor is it supported by the HUD Handbook on asset transfers. The Court cannot accept BHA's theory that a lump-

sum is only a lump-sum for the first year, as it simply has no basis in the regulations.

The only conclusion that can be drawn is that the settlement funds which were placed into DeCambre's special needs trust were *not* assets disposed of for less than fair market value under section 5.603. As a result, section 5.609(b)(3)'s requirement that annual income includes interest generated by net family assets "in excess of $5000" does not apply, insofar as DeCambre's Trust is concerned.

### 5. Conclusion on Regulatory Interpretation

Upon analysis of the relevant HUD regulations on annual income and net family assets, as well as HUD advisory publications and non-binding case law, the Court is unable to find any regulatory support for DeCambre's argument that her Trust expenditures must be excluded from annual income and that her Trust corpus remained a lump-sum settlement. To the extent the BHA treated DeCambre's expenditures as spending from an irrevocable trust, rather than from a personal settlement fund, the Court holds that their determination was a reasonable one.

### B. Due Process Claims

■ The following matters remain: whether the BHA violated DeCambre's due process rights on the basis of her disability, in their initial eligibility determination and their subsequent reasonable accommodation determination, and whether a preliminary injunction is warranted to enjoin the BHA from counting DeCambre's Trust disbursements towards the calculation of her total tenant rent. This Court determines that the BHA did not violate DeCambre's substantive due process rights on the basis of a disability, and DENIES the motion for preliminary injunction.

## 1. Substantive Due Process Claim

DeCambre raises a substantive due process claim—which was very sparsely briefed—arguing that the BHA, acting under the color of law, violated the United States Housing Act of 1937, 42 U.S.C. § 1437f et seq., by incorrectly calculating her Total Tenant Payment at $1,560 per month, and forcing her to pay more than thirty percent of her monthly adjusted income in violation of federal regulations under Section 8. Pl.'s Trial Br. 1–2, ECF No. 24. She also alleges that her due process rights were violated on the basis of disability discrimination under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 3604(c) (the Fair Housing Act), 29 U.S.C. § 701 (the Rehabilitation Act), and 42 U.S.C. § 12131 (the Americans with Disability Act). Id. at 811.

The Supreme Court has held that public housing authorities operating housing programs under federal housing law may be liable under section 1983. See Wright v. City of Roanoke Redev. & Hous. Auth., 479 U.S. 418, 428, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) ("In sum, we conclude that nothing in the Housing Act or the Brooke Amendment evidences that Congress intended to preclude petitioners' [section] 1983 claim against respondent."); see also Clark v. Alexander, 85 F.3d 146, 150 (4th Cir.1996) ("The civil rights cause of action against a state agency implementing a federal program compels federal courts to uphold the letter of federal law while allowing agencies the discretion to perform their function of reasonably administering the federal program.").

Noting that DeCambre fails to name whether she is suing the three named BHA employees in an individual or official capacity, the BHA argued that her section 1983 claims fail under either distinction. Defs.' Supplemental Br. Sept. 19, 2014

Hearing ("Defs.' Suppl. Br.") 2–3, ECF No. 17. First, if the employees were sued in their official capacity, then no personal liability is imposed and the claim is treated as against the BHA. See Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("We emphasized that official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (internal citations omitted). Second, if DeCambre intended to sue the BHA employees in their individual capacity, then the individual defendants would receive qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see also Mason v. Massachusetts Dep't of Envtl. Prot., 774 F.Supp.2d 349, 373 (D.Mass. 2011) (Tauro, J.). For purposes of analysis, this Court assumes the BHA employees were sued in their official capacity.

██ A substantive due process claim under the Fourteenth Amendment requires that a plaintiff "show a deprivation of life, liberty, or property," Connor B. ex rel. Vigurs v. Patrick, 771 F.Supp.2d 142, 159–60 (D.Mass.2011) (Ponsor, J.), aff'd, 774 F.3d 45 (1st Cir.2014), and "generally confers no affirmative right to governmental aid, even when such aid may be necessary to protect … property interests," id. at 160. The First Circuit has also upheld the use of a "shock the conscience" test for substantive due process claims against government actors. Martinez v. Cui, 608 F.3d 54, 65 (1st Cir.2010).

DeCambre's argument is solely that the BHA, a "state created political body that administers the federal Section 8 program," improperly calculated her income, resulting in her having to pay more than one hundred percent of her income to-

wards rent, in violation of 42 U.S.C. § 1437(o )(2), which limits a Section 8 tenant's rent payment to thirty percent of their monthly income. Pl.'s Mem. 7–8. No further argument was provided as to whether DeCambre has a constitutionally protected property right to the regulatory rent ceiling. *See Gammons v. Mass. Dep't of Hous. & Cmty. Dev.,* 523 F.Supp.2d 76, 82 (D.Mass.2007) (Saris, J.) ("[t]he threshold question is whether the plaintiffs have an enforceable right under section 1983 not to have their Section 8 benefits improperly terminated in violation of HUD regulations."). Simply because DeCambre had been an eligible Section 8 tenant prior to her SNT expenditures does not create a property interest in Section 8 assistance, nor has this Court been able to find any statutory or judicial authority mandating that SNT distributions are excluded from income calculations. Finally, nothing in the factual record outlining DeCambre's interactions with the BHA hints at any conduct that would "shock the conscience." As a result, this Court rules that DeCambre does not have a substantive due process claim against the BHA.

### 2. Procedural Due Process Claim

DeCambre's allegations that the BHA hearing officer failed "to find any facts or give any reason for denial of DeCambre's request for reasonable accommodation," Compl. ¶ 41, were treated as a de facto procedural due process claim by the BHA, Defs.' Mem. 9. In *Goldberg v. Kelly,* the Supreme Court laid out the requisite procedural rights recipients of public assistance are entitled to, including "timely and adequate notice detailing the reasons for a proposed termination ... an effective opportunity to defend by confronting any adverse witnesses and presenting his own arguments and evidence orally," an opportunity to be represented by counsel before a hearing officer, and the decision maker's

conclusions, "stat[ing] the reasons for his determination and indicate the evidence he relied on." 397 U.S. 254, 266–71, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (noting, however, that the written decision "need not amount to a full opinion or even formal findings of fact and conclusions of law.").

█ It is undisputed and evident from the record that DeCambre received both timely notice and hearings throughout the past year. She first received written notice on December 19, 2013, and upon request for a hearing in January 2014, she received one on May 27, 2014, at which DeCambre was represented by counsel and had an opportunity to present argument and evidence. Defs.' Mem. 9.

The hearing officer's written determination on the request for reasonable accommodation was issued on June 9, 2014. Pl.'s Mem., Ex. E, BHA Decision, ECF No. 5–5. First, the BHA determined that DeCambre's Trust expenditures should be considered "income" for rent calculation purposes, because her expenditures did not fall under the seventeen listed income exclusions under section 5.609(c). *Id.* With regard to section 5.609(c)(3)'s income exclusion for lump-sum additions to family assets from personal or property losses, the BHA argued that although DeCambre's settlement was "originally considered income by HUD regulation," once it was converted to an irrevocable SNT, withdrawals therefrom became considered income and did not fall under any other exclusions. *Id.* (Section 5.603(b)(2) counts distribution of principal from these trusts towards income).

DeCambre takes issue with the hearing officer's "arbitrary" and "whimsical" decision to include certain expenditures towards her annual income, giving "no plausible reason or explanation for the manner in which it seemed to apply some exclusions while disregarding others." Pl.'s

Trial Br. 6. While this Court takes issue with the some of the BHA's explanations, the hearing officer's June 9, 2014 written decision provided sufficient explanation of the BHA's decision to deny DeCambre's appeal of her rent calculation, noting that this writing "need not amount to a full opinion or even formal findings of fact and conclusions of law." *Goldberg,* 397 U.S. at 271, 90 S.Ct. 1011. Before critiquing the hearing officer's decision, the Court holds that DeCambre does not have a procedural due process claim against the BHA.

### 3. Discrimination Claim

■ Finally, as to DeCambre's discrimination-based claims against the BHA, this Court is unable to find any evidence as to whether the BHA calculated her Section 8 income in an unlawful or discriminatory manner, based on her status as a disabled person. The Americans With Disabilities Act mandates:

A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. § 35.130(b)(8). The Court shares DeCambre's concern that beneficiaries of special needs trust, by definition including a disabled population, may face hurdles in securing Section 8 assistance. But another facet of this argument is that the beneficiaries of all non-revocable trusts, including non-disabled persons, face the same risks as DeCambre (noting that the regulations only address "non-revocable trusts" rather than special needs trusts). As multiple treatises and publications have instructed, SNTs require careful planning and structuring by trustees to avoid losing federal benefits. *See, e.g.,*

Bernard A. Krooks, *Special Needs Trusts: The Basics, The Benefits, and the Burdens,* The American Law Institute, SR013 ALI–ABA 245, 270–271 (2009) (providing potential alternatives to an SNT for beneficiaries seeking to utilize funds a certain way, while maintaining SSI, Medicaid, and public housing assistance). Because special needs trusts are just one type of non-revocable trust, there is less potential concern for disability-based discrimination than there would be if the regulations had singled out special needs trusts.

The core problem lies in the lack of clarity in HUD provisions governing SNT beneficiaries for Section 8 benefits, and this issue should be addressed by HUD or Congress. Reviewing the decision of the BHA as to the initial income calculation and subsequent denial of reasonable accommodation requests, i.e. its treatment of DeCambre's SNT as a trust, rather than as a lump-sum settlement, is reasonable under the existing regulatory scheme. No evidence has been presented to this Court as to whether the BHA's interpretation tends to screen out disabled tenants—in fact, it appears that the BHA provided multiple opportunities for DeCambre to provide medical certification in her attempts to show a "nexus between her disability and the accommodation she claims to need." Defs.' Mem. 10 (noting that DeCambre attempted to use her counsel Larrabee as a medical expert rather than her treating physicians).

Accordingly, this Court holds that the BHA did not act in a discriminatory manner and that DeCambre's discrimination claims against the BHA cannot stand.

### C. Exclusions for Temporary or One–Time Expenses and Medical Costs

Before remanding this case to the BHA, the Court raises several issues found in

the BHA's application of income exclusions under "temporary, nonrecurring or sporadic income," § 5.609(c)(9), and under "the cost of medical expenses" exclusion, § 5.609(c)(4). In its written decision, the BHA argued that it followed HUD regulations properly excluding medical expenses and attorney's fees paid for by the Trust from its income calculation. BHA Decision 3. The BHA, however, found it unreasonable that DeCambre tried to exclude her vehicle, phone, and cat expenditures from income. *Id.* They found that DeCambre's telephone and vehicle expenses were "regular," *id.* at 2, supported by the fact that the Trust made twelve phone/cable/internet payments, nine veterinary payments, four travel payments, and two car purchase payments between December 1, 2012 and November 30, 2013, Defs.' Mem. 13–14. For example, payments of $480 and $675 were paid for her phone and internet bills in January 2013, $1,218.51 was paid in veterinary expenses to the Boston Cat Hospital in February 2013, and $3,875.12 was paid for airfare and hotel for DeCambre and a travel companion in February 2013. Trust Expenses 2–3. Nearly $5,000 more was paid for veterinary care through the spring of 2013, and $775 was paid to Comcast for phone, cable, and internet in April 2013. *Id.* at 3. An automobile purchase in the amount of $37,601 was paid for in May 2013. *Id.* at 4.

The Court is compelled to point out that case law includes "television, Internet, [and] travel" expenses as something SNTs should cover. The Third Circuit states: "A supplemental needs trust is a discretionary trust established for the benefit of a person with a severe and chronic or persistent disability and is intended to provide for expenses that assistance programs such as Medicaid do not cover." *Sullivan v. County of Suffolk,* 174 F.3d 282, 284 (2d Cir.1999) (internal quotation marks omitted). These expenses—

books, television, Internet, travel, and even such necessities as clothing and toiletries—would rarely be considered extravagant.

*Lewis v. Alexander,* 685 F.3d 325, 333 (3d Cir.2012) *cert. denied,* —— U.S. ——, 133 S.Ct. 933, 184 L.Ed.2d 724 (2013) (emphasis added); *accord Family Trust of Mass., Inc. v. United States,* 722 F.3d 355, 357 (D.C.Cir.2013). DeCambre's cable and internet expenses certainly fit within this argument, supporting excluding these payments from annual income, even though they may not be "temporary." Second, DeCambre's travel costs from February 2013 and March 2013 to visit family could also fall within allowable SNT expenditures which would exclude it from annual income.

More problematic are DeCambre's purported medical expenses (excluding her visits to the dentist and treating physicians, which appear to be undisputed medical expenses). DeCambre argues that her car, landline, and veterinary payments should be excluded from calculation of her income under section 5.609(c)(4). Pl.'s Mem., Ex. C10, Certification of Need For Reasonable Accom., ECF No. 5–3 (providing a certification from DeCambre's treating physician, with an unsigned attachment attesting to her medical need for a car, landline, and cat companionship); *see also* Pl.'s Mem., Ex. C, Larrabee Aff., ECF No. 5–3. DeCambre purchased a car on May 28, 2013, with $37,601 from her SNT, Trust Expenses 4, but because the title was held by her Trust, she argues that it is an asset of the Trust and not regularly dispersed income. Larrabee Aff. 2. A separate payment appears to have been made for car insurance totaling $3,549. Trust Expenses 4. The HUD Occupancy Handbook provides a chart of deductible medical expenses ("not exhaustive") which includes the cost of transportation, like bus

fare or car mileage, to and from medical treatment, but does not list the cost of an actual vehicle. HUD Handbook, Ex. 5–3. The Court also found the IRS' list of medical and dental expense deductions, which only provided for the cost of transportation, like "actual fare for a taxi, bus, train, or ambulance," or for "medical transportation by personal car, the amount of your actual out-of-pocket expenses such as for gas and oil, or the amount of the standard mileage rate for medical expenses, plus the cost of tolls and parking fees." *IRS Topic 502–Medical and Dental Expenses,* IRS (Dec. 11, 2014), http://irs.gov/taxtopics/tc 502.html. DeCambre's automobile purchase likely cannot fall under these medical expenses, which seem to be limited to public transportation and mileage costs, but the fact that title is held by her Trust as an asset should preclude it from being counted towards income. *See* 24 C.F.R. § 5.603(b)(2) ("In cases where a trust fund has been established and the trust is not revocable by, or under the control of, any member of the family or household, the value of the trust fund will not be considered an asset so long as the fund continues to be held in trust.").

What the HUD and IRS guidelines on deductible medical expenses do not cover are the costs to maintain a telephone line. This expense, however, seems to fall under the acceptable expenditures outlined by the Third Circuit, and could be considered a non-extravagant spending under the same reasoning allowing spending on television and Internet.

More difficult is the issue of DeCambre's cat veterinary expenses, totaling approximately $6,000. Tr. 34–35 ("she had some sick cats and ... they became ill with cancer ..... so there were a bunch of expenditures on these sick cats.... They were very expensive cats."). The HUD Occupancy Handbook covers the cost of "assistance animal and its upkeep" as a deductible medical expense, HUD Handbook, Ex. 5–3, and HUD defines assistance animals as "animals that are used to assist, support, or provide service to persons with disabilities" including "providing emotional support to persons with disabilities who have a disability-related need for such support," *id.* at Glossary 4. Noting that there is established HUD and FHA guidance on support animals, covering the right to have a service animal within a dwelling and veterinary costs of an animal, the BHA ought apply this guidance to determine whether DeCambre's cats could be categorized as emotional support animals, allowing their veterinary costs to be counted towards deductible medical expenses in annual income calculation. No such analysis was provided as to veterinary costs in the written decision, and should be provided on remand.

While this Court does not provide "a brand new hearing or evaluate the facts de novo," *Gammons,* 523 F.Supp.2d at 85, it is clear that the BHA could perform a more thorough determination of each potentially excludable expense proffered by DeCambre. By returning this matter to the BHA, the Court urges the BHA to use some of the guidance provided above in making their Section 8 income determinations.

### D. Motion for Preliminary Injunction

■ Because the Court upholds the BHA's determination in terminating DeCambre's Section 8 eligibility, a preliminary injunction mandating that the BHA stop including trust expenses towards her income calculation does not follow. Under First Circuit law, a plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: (1) a substantial likelihood of success on the merits,

(2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit between the injunction and the public interest. *Nieves–Marquez v. Puerto Rico,* 353 F.3d 108, 120 (1st Cir.2003). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir.2002). Based upon the Court's rulings on DeCambre's discrimination and section 1983 claims, De-Cambre does not meet a showing of likeli-hood of success on the merits of her feder-al due process and discrimination claims, and therefore the motion is denied.

## IV. CONCLUSION

Understanding that HUD regulation and existing case law provide deference to the fact findings and conclusions of lo-cal housing authorities, this Court affirms the decision of the BHA in their income and rent calculations for DeCambre in re-gards to her Section 8 housing vouchers. Based upon its reasonable interpretation and application of HUD provisions defin-ing special needs trusts principal in the determination of annual income, it can be concluded that DeCambre's income, as calculated by the BHA, exceeded the out-lined limits of Section 8 housing eligibili-ty.

At the same time, this case demon-strates the serious problem that benefi-ciaries of irrevocable trusts face; in par-ticular, those that seek to pour lump-sum settlement funds into irrevocable trusts. But until the rules and regulations are clarified, public housing authorities should provide clear guidance and instruction for potential tenants with regard to their fi-nancial planning and spending. A more thorough and thoughtful analysis is re-quired by public housing authorities when determining Section 8 eligibility, until fur-ther guidance is provided by the HUD.

The motion for preliminary injunction is therefore DENIED, and DeCambre's ap-peal of her Section 8 eligibility is RE-MANDED to the BHA.

**SO ORDERED.**